# ORIGINAL

**IN THE UNITED STATES DISTRICT COURT FILED IN CHAMBERS
FOR THE NORTHERN DISTRICT OF GEORGIA U.S.D.C. Atlanta
ATLANTA DIVISION**

MAR - 3 2016

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | JAMES N. HATTEN, Clerk |
| **ex rel. MIRANDA ESKRIDGE and** | ) | By: |
| **SERITA SAMUEL** | ) | Deputy Clerk |
| **and** | ) | |
| **STATE OF GEORGIA ex rel.** | ) | |
| **MIRANDA ESKRIDGE and** | ) | |
| **SERITA SAMUEL** | ) | **1 : 16 - CV - 0688** |
| | ) | |
| **Relators,** | ) | **Civil Action No. _____** |
| | ) | **Jury Trial Demanded** |
| **v.** | ) | |
| | ) | **FILED UNDER SEAL** |
| **INTERIM HEALTHCARE, INC.,** | ) | |
| **STG HEALTHCARE OF ATLANTA,** | ) | |
| **INC. f/k/a INTERIM HEALTHCARE** | ) | |
| **OF ATLANTA, INC., MATTHEW** | ) | |
| **GILLEY, PATRICK GILLEY,** | ) | |
| **REGIONAL MEDICAL GROUP,** | ) | |
| **JAMES ROGAN M.D., AND JOHN** | ) | |
| **HOUSER, M.D.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

The United States of America and the State of Georgia by and through Relators

Miranda Eskridge and Serita Samuel, bring this action under 31 U.S.C. §§ 3729-3732

("False Claims Act") and O.C.G.A. § 49-4-168.1, *et seq*. ("Georgia False Medicaid Claims

Act") to recover all damages, penalties, and other remedies established by the False Claims

Act on behalf of the United States and Relators, and the State False Medicaid Claims Act

on behalf of the State of Georgia and Relators, and would show the following:

## INTRODUCTION

1.      Medicare is a federally-funded program that provides medical insurance for certain items and services to qualified people.  In addition to paying for doctor visits, nursing home care, and hospital stays, Medicare offers a hospice benefit for eligible Medicare beneficiaries.  Hospice care services include palliative care, or care to relieve the pain, symptoms, and stress for Medicare beneficiaries who are expected to die within six months.  Hospice care services are intended to include a comprehensive set of medical, social, psychological, emotional, and spiritual services.

2.      Medicaid is a program jointly funded by the United States Government and the governments of the States that provides health care insurance for certain groups, including children, pregnant women, parents, seniors and individuals with certain disabilities.

3.      Throughout its existence, Interim Healthcare, Inc. and STG Healthcare of Atlanta, Inc. f/k/a Interim Healthcare of Atlanta, Inc. ("Interim") and their affiliated Defendants have intentionally and systematically taken advantage of some of the most vulnerable people in Georgia in order to further their scheme to defraud both Medicare and Medicaid and increase the profit of the companies for the benefit of their owners and their complicit employees.

-2-

4.     Hospice is designed to provide pain relief, comfort, and support to alleviate the suffering of patients with a terminal diagnosis and a life expectancy of six months or less who have elected to forego further curative treatment. Through Medicare and/or Medicaid, the United States and the State of Georgia reimburse qualified hospice providers for services provided to eligible beneficiaries on a per diem basis for each day that the beneficiary is enrolled, regardless of the amount of services provided on any given day.

5.     Hospice companies like Interim are entitled to receive Medicare and Medicaid funds for hospice services provided to patients who are "terminally ill." Electing the Medicare hospice benefit is a critical decision for an individual because he or she is electing to cease further curative care for his or her terminal illness.

6.     Hospices are paid a per diem rate by Medicare based in part on the level of care provided to the patient. Medicare recognizes and provides reimbursement for four levels of hospice care: routine home care, continuous home care, inpatient respite care, and general inpatient care. Medicaid generally provides the same coverage.

7.     Defendants focused on maximizing Medicare and Medicaid reimbursement for as many patients as possible while disregarding patients' medical needs and regulatory requirements.

8.     Defendants regularly ignored concerns that their hospice patients were not terminally ill or in need of hospice care and thus, were not receiving appropriate care.

-3-

9.     Defendants' business and marketing practices led to increased Medicare and Medicaid billings for hospice services, even when its patients did not need such medical services or were not eligible for certain medical services.

10.    The main claim here is that Defendants routinely recruited and certified patients as being eligible for hospice care who they knew were ineligible because they were not terminally ill. They kept those patients enrolled for years, fraudulently billing Medicare and/or Medicaid for every day that the patients stayed on their census. Defendants falsified patients' medical records in support of their claims for reimbursement. They also failed to provide hospice patients with the services that they needed and that Defendants were required to provide including failing to create or follow mandated plans of care. Defendants knowingly submitted or caused to be submitted fraudulent records and statements in support of their false claims for payment to Medicare and Medicaid including pre-signed or backdated forms and post hoc fabricated reports and records. Defendants engaged in a system of kickbacks to obtain referrals and self-referred patients. Defendants shortchanged patients by reducing visits and rationing supplies. Defendants discharged patients to avoid necessary expenses and costs. Finally, Defendants retaliated against any employee who opposed their illegal practices, including Relators.

11.    As a result of this conduct, Defendants are liable under the False Claims Act, 31 U.S.C. § 3729, et seq. and the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.1, et seq.

-4-

## JURISDICTION AND VENUE

12.    This action arises under the False Claims Act, 31 U.S.C. § 3729, *et seq.* and Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.1, *et seq*.

13.    This court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) in that Defendants live in this jurisdiction, do or transact business in this jurisdiction, and portions of the violations of the False Claims Act described herein were carried out in this district.

14.    This Court has subject-matter jurisdiction over this action pursuant to U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732(a) and (b).

15.    Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) and under 31 U.S.C. § 3732(a) and O.C.G.A. § 49-4-168.6.

## THE PARTIES

16.    Defendant Interim Healthcare, Inc.'s corporate office is located at 1601 Sawgrass Corporate Pkwy., Sunrise, FL 33323-2883.

17.    STG Healthcare of Atlanta, Inc. f/k/a Interim Healthcare of Atlanta, Inc. is a privately held company by Defendants Patrick and Matthew Gilley. It provides home health care and hospice care and has offices in Atlanta located at 6000 Lake Forrest Dr., Suite 500, Atlanta, GA 30328. It also has office locations in DeKalb County, Gwinnett County, Cobb County, Clayton County, Fayette County, and Douglas County.

18.     Defendant Regional Medical Group ("Regional") is located at 5335 Roswell
Road, Suite A, Atlanta, Georgia 30342.

19.     Defendant Dr. James Rogan is the current Medical Director of Interim and is
a practicing physician with Regional Medical Group.

20.     Defendant Dr. John W. Houser, III is a general practitioner and is located at
2600 Martin Luther King, Jr. Dr., NW Atlanta, Georgia 30311.

21.     Relator Miranda Eskridge has 23 years' experience as an RN in hospital and
home care. She began working for Interim in October 2014 as an On-Call Hospice Nurse.

22.     Relator Serita Samuel has over two decades of experience in nursing care.
She began working for Interim in October 2015 as a Per Diem Case Manager.

## STATUES AND REGULATIONS

A. Medicare and Medicaid Programs

23.     Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq*., establishes
the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare
program. The Secretary of the United States Department of Health and Human Services
("HHS") administers the Medicare Program through the Centers for Medicare and
Medicaid Services ("CMS"), a component of HHS.

24.     The Medicare program consists of several parts. Medicare Part A provides
basic insurance for the costs of hospitalization and post-hospitalization care. 42 U.S.C. §

1395c-1395i-2 (1992). Medicare Part B is a federally subsidized, voluntary insurance program that covers certain non-hospital medical services and products including the treatments at issue in this complaint. 42 U.S.C. § 1395(k), 1395(i), 1395(s). Reimbursement for Medicare claims is made by the United States through CMS. CMS, in turn, contracts with private insurance carriers to administer and pay Medicare Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the carriers act on behalf of CMS. 42 C.F.R. § 421.5(b) (1994).

25.    In order to receive Medicare funds, enrolled suppliers, including Interim, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the states expressly state that a provider must certify that it is in compliance with all federal and state statutes and regulations in order to receive payment from Medicare and/or Medicaid. 42 C.F.R. § 455, *et seq.*

26.    Among the rules and regulations which enrolled suppliers, including Interim, agree to follow are to: (1) bill Medicare for only those covered services which are medically necessary; (2) not bill Medicare for any services or items which were not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information relating to provider costs or services; (3) not engage in any act or omission that constitutes or results in over-utilization of services; (4) be fully licensed and/or

-7-

certified under the applicable state and federal laws to perform the services provided to recipients; (5) comply with state and federal statutes, policies and regulations applicable to Medicare; and (6) not engage in any illegal activities related to the furnishing of services to recipients.

27.     Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq*., establishes Medicaid, a federally assisted grant program for the States. Medicaid enables the States to provide medical assistance and related services to needy individuals. CMS administers Medicaid on the federal level. Within broad federal rules, however, each state decides who is eligible for Medicaid, the services covered, payment levels for services and administrative and operational procedures. Medicaid authorizes grants to states for medical assistance to children and blind, aged, and disabled individuals whose income and resources are not sufficient to meet the costs of necessary medical care. 42 U.S.C. § 1396; 42 C.F.R. § 430.0; 42 U.S.C. § 1396-1396v. The Medicaid Program is jointly funded by the federal government and participating states.

28.     At all times relevant to this Complaint, the United States provided funds to the States through the Medicaid program. Enrolled providers of medical services to Medicaid recipients are eligible for payment for covered medical services under the provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act. By becoming a participating provider in Medicaid, enrolled providers agree to abide by the rules, regulations, policies and procedures governing claims for payment, and to keep and

-8-

allow access to records and information as required by Medicaid. In order to receive Medicaid funds, enrolled providers, together with authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the State.

29. At all times relevant to this Complaint, Interim was participating as a Medicare/Medicaid provider.

30. At all times relevant to this Complaint, Medicare/Medicaid constituted and continues to constitute a significant source of revenue for Interim.

31. Interim submitted or caused to be submitted false claims for payment to Medicare/Medicaid for services and supplies.

B. Medicare and Medicaid Hospice Coverage

32. Interim is a for-profit hospice provider. Interim significantly funds its operations and employees through receipt of Medicare/Medicaid dollars on behalf of individuals who are supposed to be eligible to receive Medicare/Medicaid hospice benefits. One of the purposes of the Medicare and Medicaid hospice requirements is to ensure that the limited funds available are properly spent on patients who are dying and need end of life care.

-9-

33.     In order to be eligible to elect hospice care under Medicare, an individual must be (a) entitled to Part A of Medicare; and (b) certified as terminally ill in accordance with 42 C.F.R. § 418.22; 42 U.S.C. § 1395f(7)(A); 42 C.F.R. § 418.20.   According to 42 C.F.R. § 418.3, "terminally ill" means that a person "has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."  As discussed further below, there also must be specific medical information supporting the certification of terminal illness.

34.     While elderly patients may qualify for a variety of other medical services paid by Medicare/Medicaid, for-profit hospice companies, like Interim, are entitled to receive Medicare/Medicaid dollars only for Medicare/Medicaid recipients who are "terminally ill."

35.     When a business such as Interim admits a Medicare/Medicaid recipient to hospice care, that individual no longer receives, or is entitled to receive, services that would help to cure his or her illness.  Instead the individual receives what is called palliative care, or care that is aimed at relieving pain, symptoms, or stress of terminal illness, which includes a comprehensive set of medical, social, psychological, emotional, and spiritual services.  For this reason, electing hospice care is often a critical medical decision for a patient who has been informed that his or her death is imminent.  It is clear that Congress authorized funding from limited Medicare/Medicaid funds for this specialized benefit during the last several months of an individual's life.  To be covered, hospice services must

-10-

be reasonable and necessary for the palliation and management of a patient's terminal illness as well as related conditions.

36.    The statutory basis for the Medicare hospice benefit is found in the Social Security Act: Sections 1812(a)(4) and (d) (scope of benefits and benefit periods); 1813(a)(4) (coinsurance); 1814(a)(7) and 1814(i) (requirement for written certifications; payment for hospice care); 1861(dd) (services covered and conditions for hospice programs); and 1862(a)(1)(C), (6), and (9) (limits on hospice coverage). The implementing regulations are found primarily at 42 C.F.R. Part 418 (the "Regulations").

37.    The Regulations require that eligible individuals who wish to elect hospice care file an election statement with a particular hospice. 42 C.F.R. § 418.24. The hospice then files a notice of election with Medicare to begin the per diem payments. After two initial periods of 90 days, an individual may continue to receive hospice care for an unlimited number of 60-day periods, as long as he or she continues to be re-certified as terminally ill. Social Security Act § 1812(d)(1); 42 C.F.R. § 418.21; Medicare Benefit Policy Manual, Ch. 9 §§ 10, 20.1.

38.    For the initial 90-day period, the hospice provider must obtain a certification of terminal illness for the patient from both (a) the Medical Director of the hospice or a physician-member of the hospice interdisciplinary group, and (b) the individual's attending physician, if the individual has an attending physician. For subsequent eligibility periods after the initial 90 day period, a re-certification must be completed by either the Medical

-11-

Director or another physician at the hospice. 42 U.S.C. § 1395f(7)(A); 42 C.F.R. § 418.22. The doctors must prepare this written certification before the hospice submits any claim for payment. Social Security Act § 1812(a)(7); 42 C.F.R. § 418.21. This certification, along with other clinical information and documentation that supports the patient's prognosis, must be filed in the patient's medical record with the hospice. 42 C.F.R. § 418.74.

39.     The written certification requires (a) a statement that the individual's medical prognosis is that his or her life expectancy is six months or less if the terminal illness runs its normal course; (b) specific clinical findings and other documentation supporting a life expectancy of six months or less; and (c) the signature(s) of the physician(s). 42 C.F.R. § 418.74.; Medicare Benefit Policy Manual, Chapter 9, § 20.1.

40.     It is also required that a plan of care be established and periodically reviewed by the attending physician, the medical director, and the interdisciplinary group of the hospice program as set forth in § 418.56. That plan of care must be established before hospice care is provided. The services provided must be consistent with the plan of care.

41.     Medicare's regulations governing hospices require the hospice medical record to include "clinical information and other documentation that support the medical prognosis" and "the physician must include a brief narrative explanation of the clinical findings that supports a life expectancy of 6 months or less as part of the certification and recertification forms." 42 C.F.R. § 418.22(b)(2) and (3).

-12-

42.     It is a condition of participation that hospices must maintain a clinical record for each hospice patient that contains "correct clinical information." All entries in the clinical record must be "legible, clear, complete, and appropriately authenticated and dated..." 42 C.F.R. § 418.104.

C. Obligations of the Hospice Provider

43.     All Medicare and Medicaid providers must enroll in the respective programs as providers, and are expected to deal honestly with the Government and with patients.

44.     In addition, all healthcare providers, like Interim and its related entities, are obligated to comply with applicable statutes, regulations, and guidelines in order to be reimbursed by Medicare and Medicaid. When participating in Medicare and Medicaid, a provider has a duty to be knowledgeable of the statutes, regulations, and guidelines for coverage of services, and, in the case of hospice care, to know that Medicare and Medicaid only reimburse for services that are reasonable and necessary for the palliation or management of terminal illness. 42 U.S.C. § 1395y(a)(1)(C). They also have to properly train and inform their employees regarding the requirements for Medicare and Medicaid coverage of hospice services.

45.     Medicare regulations for hospice providers are set forth at 42 C.F.R. § 418.

46.     Since January 1, 2011, a physician or nurse practitioner must have a face-to-face encounter with every hospice patient "to gather clinical findings to determine

-13-

continued eligibility for hospice care" before recertifying a patient for more than 180 days of hospice services and prior to each subsequent recertification. 42 C.F.R. § 418.22(a)(4). "The physician or nurse practitioner who performs the face-to-face encounter with the patient . . . must attest in writing that he or she had a face-to-face encounter with the patient, including the date of that visit." 42 C.F.R. § 418.22(b)(4). "The attestation of the nurse practitioner or a non-certifying hospice physician shall state that the clinical findings of that visit were provided to the certifying physician for use in determining continued eligibility for hospice care." 42 C.F.R. § 418.22(b)(4). In addition to the Medicare regulations, these important requirements are also contained in the Medicare Benefit Policy Manual, Chapter 9, § 20.1, along with additional descriptions and guidance for hospice providers.

47.    Recognizing the gravity of a patient's decision to forgo curative care for a terminal illness, Medicare instructs that "[a] hospice needs to be certain that the physician's clinical judgment can be supported by clinical information and other documentation that provide a basis for the certification of six months or less if the illness runs its normal course. A signed certification, absent a medically sound basis that supports the clinical judgment, is not sufficient for application of the hospice benefit under Medicare." 70 Fed. Reg. 70534-35.

48.    The clinical record for each hospice patient must contain "correct clinical information." 42 C.F.R. § 418.104. The hospice provider also must maintain clinical

-14-

records that are "legible, clear, complete, and appropriately authenticated and dated"; these records must include clinical notes such as nursing notes. 42 C.F.R. § 418.104; 42 C.F.R. § 418.310.

49.     Among the regulatory requirements for hospice providers are the requirement that each hospice patient be treated by an interdisciplinary team. As specified by 42 C.F.R. § 418.56, the interdisciplinary group should consist of, at a minimum, a physician, a registered nurse, a social worker, and a pastor or other counselor.   The interdisciplinary group is responsible for coordination of each patient's care, to ensure continuous assessment of each patient's and family's needs, and the implementation of the interdisciplinary plan of care.

50.     In treating a hospice patient, the registered nurse assumes a particularly critical role, in that he or she is responsible for providing coordination of care, ensuring continuous assessment of each patient's needs, and ensuring implementation of the plan of care.  42 C.F.R. § 418.56(a); 42 C.F.R. § 418.100(a)(2).  A registered nurse who provides direct "skilled care" must be present on each and every shift.  Neither a licensed practical nurse nor certified nursing assistant is qualified to meet the requirements of 42 C.F.R. § 418.100(a)(2).

51.     Each member of the interdisciplinary team must treat the patient according to an individualized plan of care, which is developed at the time of initiation of services and is updated no less than every 15 days.  42 C.F.R. § 418.56(b)-(d).  The hospice provider

-15-

must also develop and maintain a system of communication and integration among the interdisciplinary team, to ensure that the plan of care is being followed, and to provide for the sharing of information among the team members and with non-hospice healthcare providers. 42 C.F.R. § 418.56(e).

52.   The Medicare hospice benefit covers a broad set of services for eligible beneficiaries, including physician services, nursing care, physical therapy, social services, homemaker services, medical supplies, short-term inpatient care, and bereavement counseling for the family.   Social Security Act § 1861(dd)(1)-(2).   Hospice providers must make whatever services are necessary for the particular patient, including nursing services, available on a 24 hour basis.   Social Security Act § 1861(dd)(1)-(2); 42 C.F.R. § 418.50. Eligible beneficiaries who choose to elect hospice care agree to forego all curative treatment for their terminal condition.   Social Security Act § 1812(d)(2)(A); 42 C.F.R. § 418.24(d).

53.   Written plans of care must be established and maintained for each enrolled patient.   C.F.R. § 418.58, 68.   These plans must be established by the attending physician or the Medical Director in cooperation with an interdisciplinary team within the hospice. C.F.R. § 418.58, 68.   The plans must be reviewed periodically by the team, including when determining whether to recertify a patient as terminally ill, and that review must be documented.   C.F.R. § 418.58, 68.   The Medicare Regulations specifically note what documentation the hospice must keep for each individual.   42 C.F.R. § 418.74.

-16-

54.     The hospice provider also must "maintain an effective, ongoing, hospice-wide data-driven quality assessment and performance improvement program".  42 C.F.R. § 418.58.

55.     There are four levels of hospice care: (1) routine home care; (2) continuous care; (3) inpatient respite care; and (4) general inpatient ("acute") care.  Level 1 is commonly called "routine" care, and hospices may provide this level of care not only in private residences, but also in nursing homes and stand-alone hospice facilities.  Level 4 general inpatient care is sometimes called "acute" care.  It must be provided in a Medicare-certified hospice facility, hospital, or skilled nursing facility (42 C.F.R. § 418.98) with a registered nurse on-site to provide direct patient care 24-hours a day.  42 C.F.R. § 418.100(a)(2).

56.     Nursing services "must be made routinely available on a 24-hour basis 7 days a week."  42 C.F.R. § 418.100.  Nursing services must ensure that the patient's needs, as identified in the plan of care, are met.  42 C.F.R. § 418.64.

57.     To qualify for "general inpatient" or "acute" care, a patient must be in a free-standing hospice, a hospital, or a skilled care nursing home "for pain control or acute or chronic symptom management which cannot be managed in other settings."  42 C.F.R. § 418.302(b)(4).  This level is intended to be short-term.  42 C.F.R. § 418.98.

-17-

58.     As a condition of participation, hospices may provide care at the general

inpatient level only for "short term" periods and only when medically indicated.   The

specific circumstances allowed by the regulations are "pain control" and "symptom

management." 42 C.F.R. § 418.98 (a). A hospice is only allowed to bill the more expensive

general inpatient level for brief periods when a patient is in an acute stage, needs

stabilization, or is in transition.   If the hospice patient does not qualify for the general

inpatient level of care, then the patient receives routine care, and the patient or his/her

family is responsible for the room and board whether at home, or in a nursing home.

59.     CMS provides the following guidance with regard to "Short Term Inpatient

Care":

> General inpatient care may be required for procedures necessary for
> pain control or *acute* or chronic symptom Management that cannot
> feasibly be provided in other settings. *Skilled nursing care* may be
> needed by a patient  whose home support has broken down if this
> breakdown makes it no longer feasible to furnish needed care in the
> home setting ... [A] *brief* period of general inpatient care may be
> needed in some cases when a patient elects the hospice benefit at the
> end of a covered hospital stay. If a patient in this circumstance
> continues to need pain control or symptom management which
> cannot be feasibly provided in other settings *while the patient
> prepares to receive hospice home care*, general in patient care is
> appropriate. Other examples of appropriate general inpatient care
> include a patient in need of medication adjustment, observation; or
> other stabilizing treatment, such as psycho-social monitoring, or a
> patient whose family is unwilling to permit needed care to be
> furnished in the home.

CMS Medicare Benefit Policy Manual, Chapter 9, § 40.1.5 (emphases added).

-18-

60.     Medicare requires that at least eight hours of primarily nursing care are needed to manage an acute medical crisis.  Furthermore, "[w]hen a hospice determines that a beneficiary meets the requirements for [crisis care], appropriate documentation must be available to support the requirement that the services provided were reasonable and necessary and were in compliance with an established plan of care in order to meet a particular crisis situation.  Medicare Benefit Policy Manual, Chapter 9, § 40.2.1.

61.     The hospice is responsible for determining the correct level of care for a patient through the patient's plan of care and the involvement of an interdisciplinary team. It is incumbent upon the medical director to oversee this process to ensure that the level of care is appropriate.

D. The Medicare and Medicaid Hospice Payment Process

62.     Hospices are paid a per diem rate based on the number of days and level of care provided during the election period.  Medicare Benefit Policy Manual, Chapter 9, § 40; 42 C.F.R. § 418.302.  The payment rates are based on which level of care the hospice provider furnishes to a patient on a particular day.  42 C.F.R. § 418.302; Medicare Benefit Policy Manual, Ch. 9, § 40.  The United States reimburses Medicare providers with payments from the Medicare Trust Fund, through CMS, as supported by American taxpayers.  CMS, in turn, contracts with Medicare Administrative Contractors ("Medicare claims processors," also known as "MACs"), to review, approve, and pay Medicare bills,

-19-

called "claims," received from health care providers like Interim.   In this capacity, the Medicare claims processors act on behalf of CMS.

63.     Payments are typically made by Medicare directly to health care providers like Interim rather than to the patient. The Medicare beneficiary usually assigns his or her right to Medicare payment to the provider. The Medicare provider either submits its bill directly to Medicare for payment, or it contracts with an independent billing company to submit a bill to the Medicare claims processor, on the provider's behalf.

64.     Because it is not feasible for the Medicare program, or its contractors, to review the patient files for the millions of claims for payments it receives from hospice providers, the Medicare program relies upon the hospice providers to comply with the Medicare requirements and trusts the providers to submit truthful and accurate claims. Hospice providers are reimbursed based upon their submission of a single electronic or hard-copy form called a "CMS-1450 form."

65.     On the CMS-1450 form, the hospice provider must state, among other things, the identity of the patient, the hospice's provider number, the patient's principal diagnosis, the date of the patient's certification or re-certification as "terminally ill," the location where hospice services were provided, and the level of hospice care provided (i.e., routine home care, crisis care, respite care, or general inpatient care).

66.     On the CMS-1450 form, the provider also certifies that the claim "is correct and complete," that "[p]hysician's certifications and re-certifications, if required by contract or Federal regulations, are on file," and that "[r]ecords adequately disclosing services will be maintained and necessary information will be furnished to government agencies as required by applicable law."

67.     All Medicare providers must have, in each of their patients' files, the medical documentation to establish that the Medicare items or services for which they have sought Medicare reimbursement are reasonable and medically necessary.

68.     The physician certifications and other documents that support the claim that hospice providers make to Medicare are submitted to Medicare only if the claim for hospice services is selected for medical review, which does not happen routinely.   Additionally, it is the hospice provider, like Interim, and not the patient's primary care or treating physician, who is required to submit to Medicare the underlying documentation that supports the eligibility determination and the claim.

69.     In order to bill Medicare, a provider (such as Interim) often submits a claim form known as a CMS Form 1500 to the appropriate fiscal intermediary (FI) or MAC. Each time it submits a claim for payment by Medicare, therefore, a provider (such as Interim) certifies that the claim is true, correct, and complete, and complies with all Medicare laws and regulations.

-21-

70.    To be eligible for Medicaid reimbursement, providers must enroll in the Medicaid program.  They must declare under penalty of perjury that they are "responsible for the presentation of true, accurate and complete information on all invoices/claims submitted [to the fiscal agent]."

71.    It is not feasible for the Medicaid program, or its agents, to review each claim or patient file that supports a claim.   It does not employ doctors to review the certifications of eligibility or the medical records to ensure the hospice is complying with the requirements before paying claims.     Instead, the Medicaid program requires and trusts hospice providers to comply with the Medicaid requirements, and requires the providers to submit truthful and accurate claims.

72.    The hospice providers are required to submit certifications and other documents to support claims to Medicaid.

73.    Payment amounts are determined within each of the following categories:

> (1) Routine home care day.  A routine home care day is a day on which an individual who has elected to receive hospice care is at home and is not receiving continuous care as defined in paragraph (b)(2) of this section.
>
> (2) Continuous home care day.  A continuous home care day is a day on which an individual who has elected to receive hospice care is not in an inpatient facility and receives hospice care consisting predominantly of nursing care on a continuous basis at home. Home health aide (also known as a hospice aide) or homemaker services or both may also be provided on a continuous basis. Continuous home care is only furnished during brief periods of

>    crisis as described in § 418.204(a) and only as necessary to
>    maintain the terminally ill patient at home.
>
> (3) Inpatient respite care day. An inpatient respite care day is a day
>    on which the individual who has elected hospice care receives care
>    in an approved facility on a short-term basis for respite [this is
>    respite for their regular caretakers].
>
> (4) General inpatient care day. A general inpatient care day is a day
>    on which an individual who has elected hospice care receives
>    general inpatient care in an inpatient facility for pain control or
>    acute or chronic symptom management which cannot be managed
>    in other settings.

42 C.F.R. § 418.302(b).

74.    To bill Medicare for crisis care, a hospice must provide care that is: (1)

designed to palliate the patient's acute medical symptoms, (2) provided to the patient for

at least eight hours in a 24-hour period, counted from midnight to midnight, and (3)

predominantly nursing care, meaning care provided by a registered nurse (RN), licensed

practical nurse (LPN), or nurse practitioner (NP). 42 C.F.R. §§ 418.302, 418.204. If the

care lasts less than eight hours in a 24-hour period, the hospice may only bill Medicare for

routine home care for that day of hospice services. Similarly, if the care provided does not

consist of predominantly nursing care, the hospice may not bill Medicare for crisis care

and must instead bill for routine home care. 42 C.F.R. §§ 418.302, 418.204.

75.    Medicare also reimburses hospices for evaluation and management (E&M)

services rendered by physicians in the hospice setting. Claims for these services are

submitted using CPT codes. E&M services are billed to Medicare using CPT codes 99334,

-23-

99335, 99336, and 99337 for established patients and 99324, 99325, 99326, 99327, and 99328 for new patients.

76.     Medicare pays the highest reimbursement for CPT codes 99336 and 99337 (Level 3 and Level 4 for established patients) and 99327 and 99328 (Level 4 and Level 5 for new patients).   Billing at Levels 3, 4 and 5 codes requires that the physician has provided a more complete patient history, a more comprehensive examination, and medical decision involving a higher level of complexity, than the services provided at Levels 1 or 2.

77.     The per diem rate for hospice services is deemed to include all administrative, clinical and medical duties performed by the hospice's Medical Director, such as supervisory duties, quality assurance duties, assessments of patients' eligibility for hospice, participation in the establishment, review and updating of plans of care, supervising care and services, and establishing governing policies.  42 CFR § 418.304(a); Medicare Claims Processing Manual, Ch. 11 § 40.1.1.

## **FACTUAL ALLEGATIONS**

A. Introduction

78.     Defendant's common approach to hospice was to ignore the laws, rules, regulations, and needs of the patients, and focus on what was best for Defendants—which generally was maximizing profits.

-24-

79. Some of Defendants' most egregious conduct involves the actual targeting of patients who do not qualify and who can be easily tricked or manipulated into signing up. Interim management targets admission based on race and socioeconomic status by focusing on particular zip codes they consider to contain older minorities, who tend to have less education (and thus, will be less likely to understand uniquely hospice issues). To put a fine point on it, Defendants actually instruct their marketers to target poor, undereducated, African-Americans in zip codes 30308-30318 and promise them "extra help" or more "services" in order to get them to sign up for hospice.

80. To further clarify the horrific nature of this targeting (and its success), most of the patients signed up for hospice want to seek aggressive treatment when a problem arises, because they do not know they are signing up for hospice or what that means. Notwithstanding, this fact, Defendants put constant pressure on their employees to meet census quotas.

81. Employees are paid for admissions, and, recently, Defendants offered nurses an extra 200 miles reimbursement on their next check and a $25 gift card for every admission they could complete by the deadline set to increase the census.

82. The contrary is also true. Employees—especially nurses—are accused of "sabotaging the program" and made to fear for their jobs for not admitting patients they feel are not appropriate for hospice. Defendants overcome employee's natural tendency to

follow their conscience (and the law) with regard to patient admissions through intimidations, threats, and discrimination.

83.     Interim's previous Medical Director (Dr. Murray) was recently fired from the company for discharging too many patients that he felt were not appropriate for hospice. He has been replaced by Dr. James Rogan who is on board with admitting and keeping patients on service who are not appropriate for hospice. Dr. Rogan is instructing the nurses on admission or at the time of recertification to "add or keep them on service and watch to see if they decline." This is done to keep the census up.

84.     Defendants' employees also falsify documents all the time. However, one of the most egregious of these acts concerns a recent request by the State for documents on 15 patients. Defendants set about to "clean up" (or falsify) all the records for these 15 patients before turning over the documents to the State.

85.     As a highlight to how corrupt Defendants are, Vicky Jumper, Defendants' Compliance Director, recently resigned because she could not abide the flagrant violation of the law and the continued admission of non-qualifying patients.

B. Patients - Not Hospice Appropriate

86.     Interim's business practices led to the submission of false claims for patients who were not terminally ill and did not need end of life care. Defendants knew or should have known that the patients did not need hospice. Interim was intensely focused on

-26-

increasing and maintaining the number of patients Interim billed to Medicaid and Medicare. Decisions about patients were made based on Interim's needs (and particularly its need for money), rather than anything having to do with the patients.

87.     Defendants routinely recruited and certified patients as being eligible for hospice care who they knew were ineligible because they were not terminally ill. Defendants did this by fabricating diagnoses and falsifying supporting documentation in order to collect Medicare/Medicaid payments. Defendants' employees were trained to admit patients with diagnoses of hypertension, anorexia, shortness of breath, dementia, Alzheimer's, and other non-qualifying illnesses. Defendants focused on maximizing Medicare and Medicaid reimbursement for as many patients as possible, while disregarding patients' medical needs and regulatory requirements.

88.     Defendants encouraged their marketing and clinical staff to admit as many patients as possible, regardless of whether they were eligible for hospice. Employees of Interim are pressured to meet census quotas by Hermanda Taylor, Vice President of Patients Care Services (administrator), under the direction of the owners, Pat and Matt Gilley (the "Gilley's"). For example, the Gilly's wanted the census to be at 100 by midnight on December 31, 2015. The administrator, Hermanda Taylor, instructed staff to admit as many patients as possible in December 2015 in order to increase the census to 100. The staff was instructed to call up all patients who were recently discharged for not meeting criteria and "see if they would be interested in hospice again." The tacit admission

-27-

was that these patients would not meet criteria, but the administrator stated "it is easier to readmit patients quickly that we already know." Employees were offered an extra 200 miles reimbursement on their next check and a $25 gift card for every admission they could complete by midnight on the 31st.

89.     Relators have observed non-terminal patients being admitted on a routine basis. Patients are targeted for admission based on race and socioeconomic status due to living in particular zip codes. Marketers are targeting poor, undereducated, African-Americans in zip codes 30308-30318 promising "extra help" or more "services" in order to get them to sign up for hospice. Hospice is not explained when consents are signed and employees are told not to go into the patients' homes saying the word "hospice," but to call it "services" or say we are the "sister service" to Interim Homecare.

90.     Most patients state on admission that they want to seek aggressive care/treatment when a problem arises, because they do not know they are signing up for hospice. Interim wants the patient to sign a form saying "if they go to the hospital they will not be able to sign back on with Interim or any other hospice for 90 days." This is done to try and deter patients from going to the hospital. Interim has a very high revocation rate with patients being admitted and then going to the hospital within the first few weeks of being on service.

91.     In order for cancer patients to be admitted to hospice care, they must have cancer with metastasis, and there must be radiologic reports to substantiate this diagnosis.

-28-

Often a patient does not meet the requirements for hospice care, but if that patient has a history of cancer, Defendants will tell the Medical Director that the patient has cancer in order to get them admitted. For example, patient ET was admitted with a diagnosis of bladder cancer with no evidence of metastasis or any radiologic reports to support diagnosis. Hermanda Taylor instructed the nurse to "just put it down as a bladder mass" and we can get Dr. Rogan to sign it. The nurse was also called into the office and reprimanded for questioning the admission.

92.    Defendants enroll patients on service who they know are not hospice appropriate and in some instances keep patients on service for years such as patients JB, AS, MS, TW, HL, LG, EA, JK and H F. Many patients who were on service for hospice were not terminal and were, in fact, healthy enough to perform many daily life activities inconsistent with a terminally ill diagnosis. These include EG, LH, MH, RW and JB. AS was on service while he was working overtime on 2 jobs. He was discharged only after the nurse was unable to make visits due him always being at work.

93.    Dr. James Rogan, the current Medical Director, has no problem putting patients on service who do not qualify or even falsifying documents to support service. However, patients are being kept on service even after Dr. Rogan has determined they are no longer appropriate for hospice. Daphne Adams an RN Case Manager and Vicky Jumper the former Compliance Director made a joint visit on patient LH and deemed him inappropriate for hospice. LH was presented to Dr. Rogan in IDT meeting on January 7,

-29-

2015 and an order was written for discharge. LH is still on service and the entire team knows he is not appropriate for hospice as mentioned in the recording from the IDT meeting.

94.     Ms. Taylor has developed a new discharge plan that will prolong the patients stay on service in order to continue to receive revenue. According to the new plan, if the RN questions whether the patient is eligible for recertification, they request a joint visit with his/her clinical manager, the Director of Healthcare Services ("DHCS"), or Compliance Director. Then if recertification remains in question, the nurse must then put in an order for the Nurse Practitioner ("NP") to make a visit. After the NP evaluates the patient, if the patient is still appropriate or not they must then be discussed in the next Interdisciplinary Meeting ("IDT meeting"). If after the patient is discussed in the IDT meeting and found inappropriate, then an order is written for discharge.

95.     This "Care Circle" buys time to kept patients on service to keep the census up. All the while, Interim is continuing to receive revenue for patients who no longer meet criteria for hospice. Tammy Diefenderfer is the Director of Health Care Services and must, herself, email Ms. Taylor detailing the reason for discharge before any discharge can be granted.

96.     Hermanda Taylor also hired a newly graduated NP by the name of Marie LeBlanc. Ms. LeBlanc has no hospice experience to assist the nurses with determining eligibility. Ms. LeBlanc has been told not to discharge anyone from service and she has

voiced on several occasions how she "needs to stand up" to Ms. Taylor and tell her she cannot continue to help keep patients on service who are not appropriate for hospice. Interim's previous Nurse Practitioner, Deb Gass, was terminated because she was finding too many patients that were inappropriate. Ms. Gass was called into the office on several occasions and reprimanded by Ms. Taylor for questioning eligibility. Overall, nurses are accused of "sabotaging the program" and made to feel in fear for jobs for not admitting patients they feel are not appropriate for hospice.

## C. A list of unqualified patients follows:

97.     Patient RW is a 32-year-old African-American male admitted to Interim Hospice with a diagnosis of "Acute on Chronic systolic/diastolic heart failure." He has no documented history of heart failure and his History and Physical for admission to Hospice was obtained from Psychiatry. He has no documented Ejection Fraction ("EF") or history of taking any cardiac medications and all of RW's recent hospital visits were for psych issues—not cardiac. He is alert and oriented to person, place, and time, but his hospice consents were signed by his mother (CFE-W) who was promised "extra services and assistance" with her mentally ill son who has been aggressive and belligerent towards her in the past. She was promised two visits per week by two hospice aides to bathe him (with free soap, towels, and pads provided by Medicaid). He weighs 550 pounds and due to his obesity and his mother's desperate need for assistance he was placed on hospice for end stage heart failure without supporting documentation. RW does not know he is on hospice

-31-

and was targeted due to his socioeconomic status and his mental illness. RW's admission was necessary according to Hermanda Taylor in order to increase the census. He was admitted on December 16, 2015. The census goal was 100 by midnight December 31, 2015 per Ms. Taylor.

98.     Patient LH was admitted to Interim Hospice on December 7, 2015 with a diagnosis of senile degeneration of the brain. LH History and Physical ("H&P") shows schizophrenia and possibly a history of dementia. He was allowed to sign his own hospice consents and "order to allow natural death" despite his "documented moderately severe dementia." The order to admit LH to hospice was obtained by Hermanda Taylor and states admit for Congestive Heart Failure ("CHF") and liver cirrhosis—not senile degeneration of the brain. Ms. Taylor did not confer with Dr. James Rogan to get this order; she just signed his name. This was done in a rush to get the admission which is why the hospice order does not match the admitting diagnosis.   The Local Coverage Determination Document states the he is unable to ambulate without assistance, however, he is able to walk two miles up to a local store and hang out for most of the day. Relator Eskridge told Ms. Taylor that she was unable to catch LH at home to do his admission due to him being at the corner store. Ms. Taylor told Relator Eskridge to "just go up to the Chevron and admit him or have the marketer Renita meet me at the Chevron to help [her] get him home." Ms. Taylor also stated "you know I would not be pushing this admission if we didn't need them." LH was targeted because of his race, mental illness, and socioeconomic status. He

-32-

does not know he is on hospice. LH remains on service despite being deemed inappropriate for hospice (see Hospice Plan of Care 12/10/15). The plan now is to discharge him on March 5, 2016 at the end of the certification period (12/7/15-3/5/16). He signed the "Notice of Medicare Non-Coverage" on January 29, 2016 stating his hospice services will end on February 12, 2016. This allowed Interim Hospice to receive 90 days of revenue ($20,720). Interim Hospice has provided no services to LH or medications other than the "comfort kit" which is ordered on admission.

99.    Patient MH is a 53-year-old African-American male admitted to Interim Hospice on December 7, 2015 with a diagnosis of end stage Chronic Obstructive Pulmonary Disease ("COPD"). He lives in the same boarding house as LH in the 30314 zip code. Patient was allowed to sign the hospice consents and consent to "allow natural death" while intoxicated. Per MH's H&P his COPD was just diagnosed in July of 2015. He has had no recent hospitalizations for COPD exacerbations or increased shortness of breath, nor does he use oxygen. He is able to ambulate unassisted up to corner store two miles from his house where he hangs out for hours during the day. MH's information was presented to the Medical Director James Rogan on December 10, 2015 and was found inappropriate for hospice and a discharge order was written at that time. Nurse Director Tammy Diefenderfer stated that "discharging from hospice is a process" and instructed the case manager to keep patient on service until further notice in order to keep the census up and continue to receive patient's revenue. The MD order to discharge patient from hospice

-33-

was written and placed in the system on December 10, 2015, but has since been removed and the patient is still on service. The RN case manager has been unable to make visits on MH because he leaves when he finds out someone from Interim Hospice is coming to visit him.

100. Patient AB is a 87-year-old African-American male admitted to Interim Hospice on November 9, 2015 for protein malnutrition in the 30311 zip code referred by Dr. John Houser. Interim provides kickbacks to Dr. Houser for his referrals. AB's H&P provided by Dr. Houser shows a weight gain of 3 pounds and an increase in his BMI (Body Mass Index). AB has no documented terminal illness, so he was brought on service under protein malnutrition in order to "watch him for the first cert period" to see if he declines. Nurses are told to bring patients on service and then just watch them to see if they decline in order to increase the census and receive revenue for the first 90 days. Interim Hospice uses the diagnoses (protein malnutrition and senile degeneration of the brain) in order to bring people on service who do not have a terminal illness. AB does not know he is on hospice and thinks he is receiving "extra services" along with the services he already receives from another company. AB's only problem is debilitating rheumatoid arthritis.

101. Patient HF is a 74-year-old African-American male admitted to service on October 10, 2013 with a diagnosis of dementia. He has been on hospice service for approximately two years. HF was recently presented in an IDT meeting, and an order was written on November 16, 2015 to discharge him due to extended prognosis. HF should

have been discharged from hospice on November 27, 2015, but Nurse Director Tammy Diefenderfer made the decision to recertify him for service on November 29, 2015 in order to keep the census up and collect revenue despite no documented decline. HF is still on service and receiving weekly visits.

102. Patient DW is a 69-year-old African-American female admitted to Interim Hospice on October 13, 2015 with a diagnosis of unspecified sequelae of unspecified cerebrovascular disease. She is morbidly obese with a history of multiple chronic conditions (hypertension, diabetes, pain, and seizures). She has no evidence of a documented terminal illness and only a past medical history of Cerebrovascular accident ("CVA") with some left sided residual. She has no documented weight loss or history of a poor nutritional status and no documented serum albumin less than 2.5. She is five feet tall with a Body Mass Index of 51.4 and a Mid-Arm Circumference ("MAC") of 53 cm. She has no history of aspiration pneumonia or difficulty swallowing. Her son was promised by the Marketer "extra services" and assistance with financial issues (delinquent gas/utility bills) when hospice consents were signed. While on service, it is documented that she is eating 80% of three meals per day, her weight is stable, and she has had no decline since her first certification. However, DW is recertified for hospice again on December 30, 2015 for a second benefit period in order to continue to collect revenue and keep the census up despite order written to discharge her from hospice. Hermanda Taylor wanted the census to be at 100 on December 31, 2015. When DW was recertified for

hospice, her case manager, social worker, and administration were aware that her continued hospice stay was contingent upon her being able to receive services from SOURCE and hospice at the same time. However, due to new regulations with state Medicaid regarding SOURCE, she cannot receive assistance from SOURCE and be on hospice at the same time. Accordingly, she was removed from hospice on January 5, 2016 and went back to home health. She was not hospice appropriate at admission and was targeted due to her race, socioeconomic status and son's need for extra assistance. This is noted in "Hospice Skilled Nursing Visit Notes" dated December 2, 2015 and January 3, 2016 that are stamped "electronically signed by Relator Eskridge." It is important to point out that the administration signed Relator's name to these notes as she has never seen this patient.

103. Patient ED was bought on service in the early part of the summer of 2015 for end stage cardiac disease. There were no labs on the chart. Her History and Physical were obtained via her last hospital visit. Her history was that 20 years prior she had open heart surgery. She was told that she was going to receive more "services" through the "program". Her only relevant history was rheumatoid arthritis, as well as mild hypertension. She never declined while on service. Relator Samuel visited this patient several times and never saw any decline. At the end of the summer, going into her 3rd certification period, Relator was at her apartment when her regular physician called. She asked who Relator was and why had ED been put on hospice. She went on to say that she had been her primary care doctor for the past 5 years and that ED was not appropriate for hospice. She questioned Relator

about how an order was given for her patient. No one had contacted her concerning ED being placed on hospice. She worked for JenCare. Relator then gave her the name and phone number of the director of patient care and nursing services (Tammy Diefenderfer). Shortly after that ED was promptly discharged from services and deemed inappropriate for services.

104. Patient MO is a 90-year-old female admitted to service on August 2, 2014. She is in her 32nd benefit period. She was admitted under the diagnosis of end stage lung cancer with metastasis. During morning report on February 29, 2016, Tammy Diefenderfer stated "we just got her History and Physical on 2/23/16 and it shows that she "does not have lung cancer" so her diagnosis will need to be changed as soon as possible. She has no terminal diagnosis listed on her H&P only that "she was in hospice for lung mass presumed cancer." She only has a history of chronic constipation, severe kyphosis, and chronic back pain. Her albumin was 3.3 and calcium level was 3.7 on admission. The only lung condition she has had has been community acquired pneumonia back in 7/2014 treated with an antibiotic. Interim's "Local Coverage Determination Document" also has her listed as having COPD and Congestive Heart Failure ("CHF") neither of which is validated by her H&P. Interim did not try to validate her diagnosis, but just went on what her Power of Attorney ("POA") said. Not only did they give her a diagnosis of lung cancer, but one with metastasis with no radiologic report. She is a chronic not terminal patient who has been allowed to stay on hospice for 32 benefit periods with an incorrect diagnosis.

-37-

105. Patient LB is a 51-year-old African-American female admitted to service on June 30, 2015 with a diagnosis of Hepatorenal Syndrome. She was admitted with no supporting documents (no prothrombin time ("PT"), no International Normalized Ratio ("INR"), no serum albumin, and no serum creatinine). She was referred by Dr. John Houser who receives kickbacks. LB was homeless with no place to go upon discharge from Atlanta Medical Center-South Hospital. She was placed in General Inpatient Care ("GIP") at Doctor's Hospice of Georgia in Riverdale ("Doctor's Hospice Riverdale") for 7 days by Interim until the Interim social worker, Shaundell Austin, could find a place for her and her daughter to stay. Interim Hospice promised the patient's family assistance with acquiring a place to stay and assistance with some other financial needs. LB wants to pursue treatment and has called 911 on several occasions, but is being turned down by EMS because she is on hospice. She has also gone to the ER seeking care, but has been turned down because she is on hospice. She is receiving visits from hospice aide (Kaya Woods) two times a week not for assistance with Activities of Daily Living ("ADL"s), but to "talk and watch movies." A check was written out to Interim social worker Damond Harris for approximately $300 to pay LBs' utility bill however, Mr. Harris cashed the check and kept the money causing the patient's electric power to be turned off. LB then had to move to a hotel, Hometown Inn, with her eight-year-old daughter briefly until she received her check the following month. She cares for her eight-year-old daughter full time and her three-year-old grandson during the day while his mother works. She cooks, cleans, drives,

-38-

shops and takes care of all of her normal business herself (i.e. going to Social Security Office and sitting all day to sign up for benefits). LB is poor African-American female with a chronic liver condition that is not terminal at this time. She does not understand the hospice philosophy and wants to live to see her daughter grow up. Interim Hospice likes to target poor, uneducated African-Americans because they see them as easy to fool.

106.   Patient JB is a 67-year-old African-American male that was admitted on service for end stage liver cancer in July 2015. Since JB has been on service, he has had 2 recertifications of his terminal illness. Relators have done several RN visits with this patient. First, there are no labs that support the diagnosis of end stage cancer. The physician that dictated the H&P gave a diagnosis of liver cancer, but not a terminal diagnosis. Since coming on service, JB's only decline is a complaint of pain. He uses his pain medications very sparingly they usually last him approximately 45 days or more. He walks over 1-2 miles a day. He reports he still works a little with his former employer for "extra change." He has no weight loss. He has no jaundice. He is able to do all his activity of daily living himself. He reported these findings to a Nurse Practitioner and to a clinical supervisor. Relator was told he will be reevaluated, but not prepped for discharge. He will be recertified and watched for another certification period.

107.   Patient RW is a 42-year-old African American male admitted to Interim Hospice on June 5, 2015 with a diagnosis of end stage Congestive Heart Failure. He is the grandson of VA who is also a patient on service. RW was targeted due to his history of

-39-

substance abuse and lack of education—making him an easy mark. He was told that he would get help getting his medications especially the narcotics and some other "extra help" in order to get him to sign up for hospice. RW does not know what hospice is nor why he was chosen for the service. He sees Interim Hospice providing medication for his grandfather whom he takes care of and is assured that Interim would do the same for him. He was kept on service for 4 benefit periods knowing he did not meet criteria for hospice. The Hospice Certification of Terminal Illness for the 3rd benefit period was written to make him look "sicker" than what he is. However, RW was going outside of his home on a daily basis without assistance or the need for oxygen. It is written on the Hospice Certification of Terminal Illness for the 4th benefit period to discharge him from hospice, but at "the end of the cert period," which would allow Interim to continue to bill for service on a patient they know is not appropriate for hospice. Because it was so obvious that RW did not meet the criteria, he was discharged before the March 30, 2016 date (after being seen by Alissa Boston the Clinical Manager).

108.   Patient AR is a 52-year-old African-American male admitted to Interim Hospice on July 15, 2015 with a diagnosis of CHF. He has no documented ejection fraction less than or equal to 20% and is not being treated with diuretics, vasodilators, hydralazine, or nitrates. He has no documented angina or continued O2 use. His H&P was obtained from a surgical physician (Dr. McCready) who saw him after he sustained a fall and hit his head, which was not cardiac related. He has a history of CHF but no supporting

documentation describing end stage cardiac disease. He has a history of end stage renal disease for which he receives dialysis 3 times a week. His CHF is chronic not terminal. His last hospitalization was on February 6, 2015 for a right hip abscess and surgical debridement. His "Hospice Certification of Terminal Illness" states he has a "significant medical history of CHF, dyspnea on exertion and uses O2 PRN" however his most recent visit from NP (Marie LeBlanc) on January 3, 2016 documents his O2 sat at 98% on room air. This is an "improvement" from the O2 sat of 91% on room air documented at the beginning of service on July 23, 2015 (see Hospice CTI 7/23/15). It is also being documented that his MAC has decreased by 3.5 cm, however, he eats 80% of his meals (see narrative note). He remains on service and is in his 3rd benefit period despite showing an improvement in his condition.   This has allowed Interim Hospice to collect approximately \$33,051 on a chronic—not terminal patient. His admission to hospice order is signed by Hermanda Taylor—the same as all the others to ensure he is admitted to service. He is like all of the other poor, African-American patients admitted in that he was promised "additional help" in order to get him to sign up. He has developed an addiction to acetaminophen-oxycodone and calls frequently requesting refills.

109.   Patient SE is a 98-year-old African-American female who lives in the 30310 zip code and who was readmitted to service on January 9, 2016 with a diagnosis of senile degeneration of brain. She was just recently discharged from service for no longer meeting hospice criteria (see JenCare patient referral).   This is her 6th benefit period (at

approximately $65,000). She has conflicting Functional Assessment Scale ("FAST") scores documented within a 2-10 day time period. Her case manager (Shirley Mexil) documents 7C, and NP (Marie LeBlanc) documents 6E. It is also documented that she has had a significant decline cognitively with nothing to support this claim other than not being able to recognize her daughter-in-law's face and name. Per the notes she is "confused but able to make needs known" and able to "sing songs" which is also conflicting. She eats 80-100% of her meals and is able to feed herself. She is able to stand and transfer to the chair with assistance. In order to qualify for dementia, patients need to have a FAST of 7C and one or more of the following in the last 12 months (aspiration pneumonia, pyelonephritis, septicemia, multiple pressure ulcers, recurrent fevers or inability to maintain sufficient fluid and calorie intake). She has had none of these symptoms. She has gained about 60 pounds since being on hospice. SE was brought back on service to boost the census despite showing no "decline" in condition. When patients don't have a terminal diagnosis, Ms. Hermanda Taylor instructs the nurses to use senile degeneration of the brain.

110. Patient LR is a 79-year-old African-American male admitted on June 24, 2015 via a primary care doctor. The physician sent over the referral for hospice admission for terminal diagnosis of end stage renal failure (stage 5). No labs were sent, nor did Interim request lab work for LR. LR has had no decline, no nausea, no weight loss, and no vomiting. He has not had a change in mental status. Per Medicare, he has to have 1

-42-

documented bun and creatinine of >8 and >78-80 bun and refusing dialysis to qualify for a terminal diagnosis of renal failure. The Medical Director was given all this information at IDT and chose to recertify this patient.

111. Patient CC is a 52-year-old African-American female admitted to service on January 29, 2016 with a diagnosis of Human Immunodeficiency Virus ("HIV"). The Admission order is written by Tammy Diefenderfer who has not seen the patient. CC's History and Physical shows no evidence of end stage disease (see Community Health Services History). Hospice criteria for HIV/Aids states patient's CD4+ count should be less than 25 cells/mcl. CC's CD4+ count is 141. She is 120 pounds with a BMI of 20.60 and an albumin level of 4.3. She has no documented history of weight loss, infections, or decline. In order to get patient on service, Katrina Ruffin promised the patient's niece, KC, that Interim would pay her $425 car note and provide sitter services for the patient so she can work during the day driving for Uber. Since being on service, Interim has not made good on giving KC the $425 for the car note or a sitter so she can work and now she is upset and threating to take CC off of service. In order to appease her, Interim placed CC in GIP at MeSun Hospice so her she can work until they can figure something out. CC's GIP diagnosis is for management of diarrhea and medications. She is having 1-3 loose stools a day and receiving "1" dose of Imodium a day for management. 1 to 3 loose stools a day is not uncommon or excessive for an HIV patient and does not qualify her to be in GIP. Hermanda Taylor instructed Renita Kelley, the Office Manager, to take patient's

-43-

niece to Kroger and buy groceries for their household in order to keep the patient from revocating. The administrator has had two meetings with CC's niece regarding providing financial assistance for her car note and other bills. CC has been in GIP for 14 days at a higher rate of reimbursement knowing she does not meet criteria for GIP or Hospice.

112.    Patient OW is an 88-year-old African-American female admitted to service on December 4, 2015. She was referred by Dr. John Houser (a physician Interim provides kickbacks to), and she lives in zip code 30310 (a target zip code). OW was promised a sitter by Interim that would come and sit with her to provide companionship. After she signed up for service, she was told that she could not have a sitter because she has SOURCE, but Interim knew she had SOURCE from the beginning. OW is listed as having dementia but was allowed to sign her own consents. The Certification of Terminal Illness ("CTI") makes her "look" like she is sicker that what she is. She "does not" wear oxygen continuously. She "is able" to ambulate without getting severe dyspnea (shortness of breath). Her Palliative Performance Score ("PPS") in "not" 40. She "is not" incontinent of bowel and bladder and she needs "no" assistance with her ADLs. All of these things were made up so she could be recertified for a second benefit period. Additionally, her history shows that she has Coronary Artery Disease ("CAD"), CHF, schizophrenia, and mild dementia. The admitting diagnosis is COPD. There is nothing in the History and Physical that mentions COPD. The other comorbidity, Congestive Heart Failure, does not list an ejection fracture nor does it have pulmonary function testing.    The nursing

-44-

assessment on admission states patient had a room air sat of 89% after ambulating. She reported using albuterol nebulizer treatments intermittently. OW has oxygen in her apartment, but does not use it very often. The Medical Director of Interim Hospice said to admit her with diagnosis of COPD. She was recently up for recertification. Relator spoke with the NP about her. Relator told her that this patient did not meet any criteria for her terminal diagnosis. Relator went down the list of why she does not meet the criteria. The NP said that she would discuss it with the administrator.    OW is ambulatory and independent.    She does her own ADLs.    She pays all her bills.    She does her housekeeping and cooking. She is on room air most of the time. She has not used any of her albuterol medications in the 90 days she has been on service. She does not need any other medications. The bottles are completely full every visit. Her blood pressure and heart rate and oxygen saturation are all within normal limits despite her not taking any of her medications.

113. Patient EG is a 94-year-old African-American female admitted to Interim Hospice on October 9, 2014 with a diagnosis of Congestive Heart Failure. She is in her 13th benefit period. She has no documented ejection fraction less than or equal to 20%. Her H&P sent in by Dr. Nayak paints a picture of a chronic cardiac patient—not a terminal patient. She only takes a low dose diuretic and two cardiac medications. She does not wear continuous oxygen and does not have a palliative performance score of 40%. The Local Coverage Determination Document, Narrative Note, Plan of Care Summary, and

Hospice Certification of Terminal Illness have all been made out to make her look like she is sicker than what she is in order to keep certifying her for hospice. It is being documented that she is losing weight but she eats 60-70% of her meals and weighs 184 pounds and has a BMI of 31.2. She lives alone and is able to cook her own as well as go outside of her house on outings to funerals and restaurants. Tammy Diefenderfer has instructed her case manager to look at her case to see if she is "truly declining" because they want her off of service now that the reimbursement is lower for someone who has been on service this long and they have a state survey that is coming up soon. Prior to this, staff was instructed to discharge "no one". Interim Hospice has collected over $100,000 in reimbursement for EG who is a chronic—not terminal patient.

114. Patient OS is a well-nourished 92-year-old female that was admitted to service for dementia. She was admitted on April 23, 2015. She is in her 5th recertification period as of now. The admission H&P does not list any history of dementia. The patient was not taking any medications that were for dementia. She was a non-insulin diabetic and had hypertension that was controlled. The last few face-to-face encounters have her listed as 6E and 7A and PPS 30 and PPS 40. Relator performed several visits from the summer to the end of last year with this patient. She is very talkative and answers question appropriately. There is no issue with oral intake as she is very well nourished. She is cared for by her daughter C. She reports she was told she was going to receive additional "services" to assist her with care of her mom. They live in a very high crime area of

-46-

Atlanta.  The primary caregiver of the patient has very minimal education and does not understand what is going on.  On admission this patient did not meet criteria for admission—her FAST scale was at best 6D-6E with no stage 3-4 decubitus, no weight loss, and no sepsis.  The only hospital stay was for a fall where she sustained a broken hip.  No comorbidities of CHF, COPD, or CAD.

115.  Patient FS is a 69-year-old African-American male that was admitted with CVA on July 25, 2014.  He has comorbidities of end stage renal disease, hypertension, and diabetes.  He is on Hemodialysis three times a week.  He is coming up on his 10th recertification period.  He has not had any significant decline.  His disease state is more chronic versus terminal.  He is cared for by his sister who takes great care of him.  The Nurse Practitioner has recertified him the past nine times, but there is no significant weight loss and no decrease in PPS. There are no changes in or decrease from wheelchair bound to bedbound for almost two years on services.  FS is an example of a chronic patient being kept on service with no evidence of decline.  He has none of the qualifying criteria for Stroke.  His PPS (Palliative Performance Score) is being documented as a 30 which would make him "totally bedbound".  He is able to transfer from bed to chair with assistance and goes to dialysis three times per week.  He does not have a poor nutritional status with an inability to maintain sufficient fluid/calorie intake. He eats 80% of three meals per day.  He has no documented albumin level less than or equal to 2.5 gm/dl and no documented weight loss.  He has no H&P listed that supports this diagnosis.

-47-

116.   Patient WW is a 66-year-old African-American male that was admitted to service on August 17, 2015. He was admitted with a diagnosis of COPD. He has comorbidities of diabetes, hyperliperdemia, and tobacco abuse. The admitting physician referral was for CHF. There was no documented ejection fracture on H&P, so per the Medical Director, James Rogan, he was admitted with COPD. He is now coming up on his 4th recertification period and there is no sign of decline. This patient walks around all day without the use of oxygen and walked the Nurse Practitioner to her car without oxygen. He was discussed for possible discharge, but has to be given administrative clearance from Ms. Taylor. WW is an example of Defendants' practice of "bring them on service and watch them to see if they will decline." Normally, Interim would keep him on service, but now they are concerned about getting into "CAP" trouble and having a state survey so they are pushing people off of service quicker now, if they can't show a decline. His admitting History and Physical describes his COPD symptoms as "mild" and "fairly controlled". He has nothing documented that would suggest end stage disease. He does not have disabling shortness of breath. He is not taking any bronchodilators. He does not have a bed to chair existence and no unintentional progressive weight loss. He is able spend a lot of time outside of his home and walk around outside in the yard without oxygen. He has signed his BIPPA Form to be discharged on March 3, 2016. Interim is trying to discharge him as close to the 180 day mark as possible because of the higher reimbursement rate. They have

collected approximately $30,000 off of a patient that was not appropriate for hospice at admission.

117.  Patient MH is a 94-year-old African-American female admitted to Interim Hospice on February 17, 2016 with a diagnosis of Alzheimer's disease.  Her admitting H&P obtained from Dr. Millard J. Collier (whom Interim tried to hire as their Medical Director after Dr. Hodge) does not support a declining condition warranting the need for hospice service.  Her FAST score is being documented as a 7A, and she has none of the other supporting conditions to validate eligibility.  She has no documented albumin level and she eats 100% of her meals.  Her son states he puts her into the car and she rides everywhere with him on a daily basis.  Realtor made an on-call visit to see her on February 19, 2016 and because she "looked so well" she asked how she got placed on hospice.  Her son (SJ) stated "I know she is not supposed to be on hospice, but they told me I could get some extra help with bathing her."  "I know what hospice is and I know she is not dying."  "I want her to live as long as she can, and if it looks like she is heading the clouds, I'm not going to call 911, I'm going to put her in my car and drive her to the hospital myself."  MH is an example of Interim Hospice promising family members "extra help" in order to get them to sign up for hospice services knowing they do not meet hospice criteria.

118.  Patient LM is a 92-year-old female that has been on service since May 29, 2014.  She has a terminal diagnosis of Alzheimer's disease.  She is coming up to her 13th recertification period.  There has been no significant decline.  The only thing charted is a

-49-

.5cm decrease in her MAC. She remains a 7A and PPS remain 30. She is not terminal, but in a chronic disease state. For the past 12 recertifications, the NP has basically charted the same narrative on her. There is no H&P in chart to even verify patient history of dementia. LM is an example of a chronic patient being kept on service with no supporting evidence of decline. Her FAST score was documented as a 7A on admission May 29, 2014 and is still a 7A after 12 benefit periods. Her case manager is documenting that she has "unintelligible" speech, but the chaplain, social worker, and LPN are documenting that she is able to answer direct questions and make her needs known. She has no documented albumin level and eats 80-90% of 2-3 meals/day. Her hospice CTIs (Certification of Terminal Illness) describes her as having a significant medical history of end stage Alzheimer's disease, but she has no documentation to support this.

119. Patient MG is a 97-year-old African-American female admitted to Interim Hospice on May 16, 2014 with a diagnosis of Alzheimer's disease. She is in her 10th benefit period. The History and Physical used to determine her hospice eligibility describes her dementia as "dementia with psychosis improving." In order to qualify for hospice under the diagnosis of dementia, the patient must be Stage 7C or beyond on the FAST scale. MG has conflicting documentation regarding her FAST score. In some notes it is being documented as a 7A and a 7B in others. She has no documentation of a FAST score of a 7C or beyond. She has none of the other qualifying conditions (aspiration pneumonia, pyelonephritis, septicemia or multiple pressure ulcers stage 3-4). She has only had "one"

-50-

urinary tract infection which was treated with an antibiotic. Her albumin is listed as 3.5 and her appetite is improving. She has gone from eating 50% of 2-3 meals a day to 70% of 2-3 meals a day. It is also being documented that her PPS is 30, however she is not totally bedbound and can transfer to a chair with assistance. Interim knows that MG is not declining, but has kept her on service in order to collect her Medicare reimbursement. Interim is now considering discharging her off service because as off January 1st the Medicare reimbursement for her is considerably lower, and they don't want to get into "CAP" trouble with a patient that they are not making that much money off of (per Tammy Diefenderfer, Director of Health Care Services).

120. Patient ST is a 78-year-old African-American male admitted to Interim Hospice on November 11, 2015 with a diagnosis of heart failure. His order for hospice was written by Dr. John Houser. His admitting History and Physical provided by Southwest Atlanta Nephrology makes no mention of his heart failure and reports no chest pain, no shortness of breath, no recent hospitalizations, and no medications. The H&P provided by Dr. Houser to determine his hospice eligibility lists heart failure, but no declining condition that would suggest end stage disease with the need for hospice. ST takes no cardiac medications, diuretics, or nitrates. There is no documentation of an ejection fractions equal to or less than 20%, no chest pain, or shortness of breath. He does not use oxygen and his oxygen saturation on room air is 99%. He eats 80-100% of his meals and his MAC has increased from 28.5 to 30cm since being on hospice. He ambulates

with a cane and needs no assistance with his activities of daily living. He was admitted to hospice despite not meeting eligibility requirements and allowed to stay on service until the end of the first benefit period. This was done to allow Interim to collect 90 days of reimbursement at the highest daily rate (approximately $14,000). He is an example of "admitting to hospice service and watching them for the first 90 days to see if they will decline."

121. Patient EH is 73-year-old African-American female who was admitted with a diagnosis of Congestive Heart Failure. She has comorbidities of CVA, HTN, and dysphagia. She has been on service since August 2, 2014. According to the chart, there is no History and Physical on chart that substantiates the diagnosis of CHF. This patient is in the 10th benefit period. The patient has had no documented decline as indicated by NP. She is on room air most of the time with documented oxygen saturations of 94 -97%. She has oral intake and is gaining weight as evidence by her MAC increasing from on admission 21cm now to 22 cm. She is on cardiac medications, with none at a maximum dosage.

122. Patient EK is a 96-year-old African-American female. She was admitted on service on August 26, 2015. She was admitted on service for Abdominal Aortic Aneurysm ("AAA"). She is in the 3rd benefit period. She has not been on any oxygen. She has no issues with edema. Her H&P states that she has had aneurysm was stable. The labs on the

H&P shows that she has had a mild renal failure. No significant decline has been documented since coming on to service.

123. Patient NT is 83-year-old Hispanic female admitted into service on February 2, 2015. She is now in her 7th recertification period. She has had very minimal decline since admission—no longer able to speak nor feed herself. She is very well nourished. She has a primary caregiver. Her spouse and a neighbor assist in her care. She is at 7C. Relator has performed visits with this family and the patient is in a chronic state—not terminal. This patient is cared for so well that Relator cannot see a possibility for death in the next year. The husband is really not on board with hospice. He is only signed up because he was given the sales pitch of additional "services". He refuses to make patient a DNR. He does not believe she is in a terminal state. There is not an admission H&P to even substantiate the diagnosis.

124. Patient Ms. EA was admitted on November 30, 2015 with a diagnosis of Malignant Neoplasm of Unspecified Part of Unspecified.

125. Patient Mr. EA was admitted on November 9, 2015 with a diagnosis of Alcoholic Cirrhosis of Liver with Ascites.

126. Patient JA was admitted on August 31, 2015 with a diagnosis of Chronic Ischemic Heart Disease.

-53-

127. Patient VA was admitted on December 8, 2014 with a diagnosis of Heart Disease.

128. Patient TB was admitted on November 20, 2015 with a diagnosis of Chronic Obstructive Pulmonary Disease-Unspecified.

129. Patient CB was admitted on December 9, 2013 with a diagnosis of Heart Failure-Unspecified.

130. Patient BB was admitted on July 7, 2015 with a diagnosis of Unspecified Sequelae.

131. Patient SD was admitted on December 21, 2014 with a diagnosis of Alzheimer's Disease-Unspecified.

132. Patient MF was admitted on September 9, 2015 with a diagnosis of Unspecified Combined Systolic and Diastolic (Congestive) Heart Failure.

133. Patient IH was admitted on September 30, 2015 with a diagnosis of Senile Degeneration of Brain-Not Elsewhere Classified.

134. Patient CH was admitted on May 22, 2015 with a diagnosis of Senile Degeneration of Brain-Not Elsewhere Classified.

135. Patient BK was admitted on January 15, 2015 with a diagnosis of Malignant Neoplasm of Unspecified Part of Unspecified.

136. Patient EK was admitted on August 26, 2015 with a diagnosis of Abdominal Aortic Aneurysm.

137. Patient GL was admitted on July 29, 2015 with a diagnosis of Chronic Obstructive Pulmonary Disease-Unspecified.

138. Patient OM was admitted on July 21, 2015 with a diagnosis of Senile Degeneration of Brain – Not Elsewhere Classified.

139. Patient LM was admitted on July 29, 2015 with a diagnosis of Senile Degeneration of Brain – Not Elsewhere Classified.

140. Patient AM was admitted on August 5, 2015 with a diagnosis of Senile Degeneration of Brain – Not Elsewhere Classified.

141. Patient CP was admitted on July 31, 2015 with a diagnosis of Alzheimer's Disease-Unspecified.

142. Patient MR was admitted on August 10, 2015 with a diagnosis of Heart Failure-Unspecified.

143. Patient IR was admitted on October 5, 2015 with a diagnosis of Chronic Obstructive Pulmonary Disease-Unspecified.

144. Patient OR was admitted on August 10, 2015 with a diagnosis of Chronic Obstructive Pulmonary Disease-Unspecified.

145. Patient PR was admitted on March 5, 2015 with a diagnosis of Senile Degeneration of Brain-Not Elsewhere Classified.

146. Patient CS was admitted on May 13, 2015 with a diagnosis of Senile Degeneration of Brain-Not Elsewhere Classified.

147. Patient CS was admitted on July 23, 2015 with a diagnosis of Unspecified Sequelae of Unspecified Cerebrovascular AR Disease.

148. Patient FS was admitted on July 25, 2015 with a diagnosis of Unspecified Sequelae of Unspecified Cerebrovascular AR Disease.

149. Patient BS was admitted on September 24, 2015 with a diagnosis of Senile Degeneration of Brain-Not Elsewhere Classified.

150. Patient DS was admitted on August 5, 2015 with a diagnosis of Unspecified Combined Systolic and Diastolic (Congestive) Heart Failure.

151. Patient Ms. ST was admitted on November 11, 2015 with the diagnosis of Heart Failure-Unspecified.

152. Patient GT was admitted on September 16, 2015 with a diagnosis of Unspecified Combined Systolic and Diastolic (Congestive) Heart Failure.

153. Patient BT was admitted on November 11, 2015 with a diagnosis of Chronic Obstructive Pulmonary Disease-Unspecified.

154. Patient CW was admitted on February 24, 2015 with a diagnosis of Senile Degeneration of Brain-Not Elsewhere Classified.

155. Patient WW was admitted on June 25, 2015 with a diagnosis of Malignant Neoplasm of Stomach-Unspecified.

156. Patient GW was admitted on November 6, 2015 with a diagnosis of Alzheimer's disease Unspecified.

157. Patient CW was admitted on June 10, 2015 with a diagnosis of Multiple Myeloma – not having achieved remission.

D. Kickbacks/Self-Referrals

158. Hermanda Taylor is essentially the Administrator and Renita Kelley is the Office Manager. Both have a special relationship with Dr. John Houser, III who is a general practice MD. They reward him with kickbacks in the form of expensive gifts such as a $700 monogramed money clip for providing referrals to Interim Hospice. Ms. Kelley is often instructed to "go by Dr. Houser's office to get some patients" whenever the census is low.

159. Marketing employees are also authorized and encouraged to provide kickbacks in the form of monetary and non-monetary incentives to referral sources, such as physicians, nurses, and other health-care professionals. Marketers are told to offer the poor and disadvantaged patients food stamps, a place to live, assistance with bills, and

-57-

Medicare if they will sign up for hospice. Patient's families are also given incentives to sign up for "the services" such as groceries and assistance with paying electrical bills. For example, patient CC was promised that Interim would pay her sister's $425 car note, groceries and pay her electric bill.

160. Interim used self-referrals and aggressive marketing techniques and paid employees bonuses and kickbacks to referral sources to increase and maintain census numbers. Andre Epps (former marketer) states Hermanda Taylor offered the marketers $300 bonuses per patient that they got to come on service and a $2000 bonus at month end for the marketer with highest admissions. Newly hired Marketer, Katrina Ruffin was given a Michael Kors purse/wallet and a Tiffany bracelet/scarf one week after being hired in order to promote aggressive marketing. She was given these gifts in the office in front of the office staff and the Office Manager, Renita Kelley.

161. Employees and staff had a process of tracking employee referrals for admissions to hospice regardless of whether the patients needed or qualified for hospice care. Hermanda Taylor offers $50 per referral, extra reimbursement for mileage, and $25 gift cards for all patients that are admitted.

162. Dr. Rogan is provided financial incentive through his position as Medical Director to refer his patients to Interim—which he does.

-58-

163. CYD Home Health Services, Inc. ("CYD") provides the DME for Interim. CYD is owned by the Gilley's son, Clay Gilley. The company is horrible when it comes to providing equipment for the patients. As with other equipment and supply companies, CYD does not provide equipment when the patients need it. There have been many complaints. Hermanda Taylor's response is to have the employees write up incident reports when this happens, but nothing is ever done. For example, Relator Eskridge had a patient who needed oxygen. The patient died before the oxygen was delivered.

E. General Inpatient ("GIP")

164. Interim Hospice also admits patients to General Inpatient ("GIP") who do not display any symptoms requiring GIP management in order to bill for the higher reimbursement rate. For example, Patient DM was sent to MeSun Hospice as GIP on October 1, 2015. She was kept GIP for 24 days despite not displaying any symptoms for management. She was kept GIP due to "inability to stay home alone." She was not downgraded to respite because MeSun Hospice does not like to have patient on respite and the patient's family did not have anywhere for her to go. Medicare was billed the GIP rate for this patient who did not meet GIP criteria. The billing differential was approximately $440 per day.

165. As another example, Patient WJ was admitted GIP to Doctor's Hospice Riverdale on January 15, 2016 for management of agitation despite having no symptoms. The patient's family did not want to take him home from the hospital, so in order to secure

-59-

the admission, he was admitted to Interim Hospice and placed GIP. Hermanda Taylor says "all patients coming out of the hospital can be admitted GIP" and we can just use "agitation" as a symptom whether they have it or not.

F. Falsification of Medical Records

166. Employees of Interim falsified documents to support patients' hospice eligibility. Employees and Dr. James Rogan, Medical Director, doctored patient records to make the patients appear "sicker" than what they actually were. Defendants also discouraged medical staff members from including language in the medical record that the patient's health was improving whether or not that was an accurate description of the patient's condition. Hermanda Taylor and Tammy Diefenderfer specifically instructed staff to chart only the "decline" on patients—not their improvements.

167. Defendants also falsified patients' medical records in support of their claims for reimbursement and knowingly submitted or caused to be submitted fraudulent records and statements in support of their false claims for payment to the Medicare and Medicaid including pre-signed or backdated forms and post hoc fabricated reports and records. When patients go to the hospital and are admitted, Interim will back date Revocation forms to the first date they are in the hospital.

168. When patient visits are not documented, Interim cannot bill for Medicare/Medicaid for services. Angie Stites (former case manager) resigned and her last

-60-

day with Interim was October 2, 2015. She left 43 patient visits undocumented. The Director, Ms. Diefenderfer, documented visits on patients listed below that she did not see in order capture revenue on these patients. The patients are as follows: JB, KB, SC, BC, JG, DG, LG, JJ, DL, PM, DM, MO, CP and CW.

169. In a particularly egregious and offensive example of both hubris and actual intent, Defendants are falsifying patients' records requested by the State of Georgia. Defendants received a survey asking for nurses' notes and Certifications of Terminal Illness ("CTIs") for certain dates for 15 patients. Unsurprisingly, these patients' files are "missing documentation." The clinical manager, Alissa Boston, has stated directly that Defendants are going to "create" some documentation (nurses' notes and CTIs). Office Manager Renita Kelley was to meet Dr. Hodge at 6 AM on February 29, 2016 to have him sign the CTIs to submit to the State.

G. Recertification of Patients

170. Patients of Interim did not show a decline in health (particularly those who should not have been admitted), making them ineligible for recertification for hospice care, but the hospice kept them on hospice care and continued to bill Medicare.

171. CMS requires hospices to have established and implemented internal processes to comply with the requirement to meet patients in person before recertifying them as terminally ill and in need of continued hospice care. Defendants developed a

-61-

process called "The Care Circle" that is designed to "buy time" to keep ineligible patients on service while they send several people out to see the patient to determine eligibility then discuss them in IDT and then email Hermanda Taylor with details to determine recertification. This process in most patients take 2 weeks or longer. The goal is to try and keep patients on service until the end of their certification period.

172.   Medicare requires hospices to complete face-to-face visits as a requirement for recertification for hospice benefits.  Dr. James Rogan, Medical Director, does not do "face to face" visits.  Defendants rely on Marie LeBlanc, a newly graduated NP, to make face-to-face visits.  Ms. LeBlanc has no hospice experience and only three years nursing experience.

173.   Management makes all admission and recertification decisions, even though management never treats or sees the patients.  All admission orders and recertification decisions are made by administration—Hermanda Taylor and Tammy Diefenderfer. Management regularly ignores the nurses' notes, patient records, and lab work, and instead fabricates information on the admission and recertification documents so that the Medical Director will admit or recertify ineligible patients.

174.   Because the patients are not in decline, and the managers do not track the patients' progress, or even their "fabricated progress", even the IDT summaries and recertification documents themselves do not show decline, but rather simply state the

-62-

minimum requirements for admission to hospice care. Thus even the documentation fabricated to support recertification does not actually support recertification.

## H. Proper Supplies and Services

175. Defendants have intentionally and systematically taken advantage of some of the most vulnerable people in Georgia in order to further their scheme to defraud both Medicare and Medicaid and increase the profit of the companies for the benefit of their owners and their complicit employees. Defendants have exhibited a complete lack of concern for their patients overall including the failure to provide proper supplies and services. One example involves diapers and wipes. Hermanda Taylor has called the equipment company (Byram) and instructed them to only provide two packs of diapers and one pack of wipes every two weeks. This only allows for 2 diapers and 3.5 wipes per day. Patients who have diarrhea, are on diuretics, or void more than twice a day run out of supplies quickly. Even when the nurses call Byram to request more supplies, they are turned down. Patients routinely run out supplies and have to wait in wet and soiled diapers.

**FIRST CAUSE OF ACTION**
**(False or Fraudulent Claims)**
(False Claims Act 31 U.S.C. § 3729(a)(1)(A))
(Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.1(a)(1))

1. Relators hereby incorporate and re-allege all other paragraphs as if fully set forth herein.

2. As set forth above, Defendants, by and through their agents, officers, and

-63-

employees, knowingly presented, or caused to be presented to the United States Government and the State of Georgia numerous false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and/or the Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.1(a)(1).

3.     Due to Defendants' conduct, the United States and the State of Georgia have suffered substantial damages.

4.     The United States and the State of Georgia are entitled to treble damages based upon the amount of damage sustained by them in an amount that will be proven at trial.

5.     The United States and the State of Georgia are entitled to a civil penalty of between $5,500 and $11,000 for each of the fraudulent claims.

6.     Relators are also entitled to their attorney's fees and litigation expenses.

### SECOND CAUSE OF ACTION
### (False Statements)
(False Claims Act 31 U.S.C. § 3729(a)(1)(B))
(Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.1(a)(2))

7.     Relators hereby incorporate and re-allege all other paragraphs as if fully set forth herein.

8.     As set forth above, Defendants, by and through their agents, officers and employees, knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) and or the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-

168.1(a)(2).

9.     Due to Defendants' conduct, the United States and the State of Georgia have suffered substantial damages.

10.    The United States and the State of Georgia are entitled to treble damages based upon the amount of damage sustained by them in an amount that will be proven at trial.

11.    The United States and the State of Georgia are entitled to a civil penalty of between $5,500 and $11,000 for each of the fraudulent claims.

12.    Relators are also entitled to their attorney's fees and litigation expenses.

### THIRD CAUSE OF ACTION
**(Failure to Repay)**
(False Claims Act-31 U.S.C. § 3729(a)(1)(G))
(Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.189(a)(7))

13.    Relators hereby incorporate and re-allege all other paragraphs as if fully set forth herein.

14.    As set forth above, Defendants, by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay or transmit property or money to the United States Government and the State of Georgia and  knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit property or money to the United States Government and the State of Georgia, in violation of the False Claims Act,

31 U.S.C. § 3729(a)(1)(G) and/or the Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.1(a)(7).

15.     Due to Defendants' conduct, the United States and the State of Georgia have suffered substantial damages.

16.     The United States and the State of Georgia are entitled to treble damages based upon the amount of damage sustained by them in an amount that will be proven at trial.

17.     The United States and the State of Georgia are entitled to a civil penalty of between $5,500 and $11,000 for each of the fraudulent claims.

18.     Relators are also entitled to their attorney's fees and litigation expenses.

## FOURTH CAUSE OF ACTION
### (Retaliation Against Relators)
(False Claims Act-31 U.S.C. § 3730(h))
(Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.4)

19.     Relators hereby incorporate and re-allege all other paragraphs as if fully set forth herein.

20.     Defendants violated Relators' rights pursuant to 31 U.S.C. § 3730(h) and O.C.G.A. § 49-4-168.4 by retaliating against them for lawful acts done by them in furtherance of efforts to stop one or more violations alleged in this action.

21.     As a result of Defendants' actions, Relators have suffered damages in an amount to be shown at trial.

-66-

## PRAYER FOR RELIEF

**WHEREFORE**, Relators Miranda Eskridge and Serita Samuel pray for judgment:

a.      awarding the United States and the State of Georgia treble damages sustained by it for each of the false claims;

b.      awarding the United States and the State of Georgia a civil penalty of $11,000 for each of the false claims;

c.      awarding Relators 30% of the proceeds of this action and any alternate remedy or the settlement of any such claim;

d.      awarding Relators two times back pay, interest, and special damages resulting from retaliation;

e.      awarding Relators their litigation costs and reasonable attorney's fees; and

f.      granting such other relief as the Court may deem just and proper.

Respectfully submitted,

Mike Bothwell
Ga Bar No. 069920
Mike@WhistleblowerLaw.com
Attorney for Relators

BOTHWELL
LAW GROUP
304 Macy Drive
Roswell, Georgia 30076
Ph: 770-643-1606
Fax: 770-643-1442